3 20 0 2 2 0. The people of the state of Illinois at believe versus by Hey, a Sam appellant. Miss Ware, you may proceed. You may please the court. My name is Jessica Ware on behalf of the Office of the State Appellate Defender, and I represent the appellant, Mr Baja. Yeah, your honor's today. I'd like to touch on both of the issues raised in my briefs. The only issue in this trial for the jury to decide was Mr Sam's mental state at the time that he killed his wife, whether he was insane, mentally ill or neither. The defense's expert testified that he was insane, and that was based largely on his mental health history. And the state's expert testified that he wasn't insane, and that was based largely on Sam's videotaped statements of police. But the trial court committed reversible error when it allowed the state to present its best evidence of Sam's mental state twice at trial once during its case in chief and again in closing arguments, allowing the state to replay Sam's videotaped statement in closing arguments unduly emphasized that single piece of evidence in this close case. The courts have long held that the jury must pass upon all the evidence at trial's waning moments, but that's exactly what happened here. And people versus Ammons, this court held that the trial court committed error by allowing the state to replay the defendant's audio tape confession in closing argument. And in that case, the court held that it dramatically over emphasized that single piece of evidence. And there were three reasons that the court held that the reason why the error was so prejudicial in the case. And one was because the only issue in dispute was the defendant's mental state at the time of the killing. And the state's best evidence was the the audio tape. And third, because the evidence at trial was not overwhelming. And all three of those factors are present in this case. The only issue in dispute was Mr. Sam's mental state. The video was the state's best evidence. According to the state, it was its best evidence of Sam's mental state at the time of the offense. And the evidence was not overwhelming in this case. Now case law has held that playing a small portion or a small fraction or a limited excerpt of a video tape statement in closing is not an abuse of discretion. But in this case, we have the full confession from the Miranda warning all the way to the end being replayed for the jury. So 100% of the statement just like an Ammons is being replayed for the jury. The state only cut out the first 17 and a half minutes of the recording before the interrogation started. And even if you count that, that was still 70% of the entire video, 100% of the statement being put before the jury a second time. That was no Miss where let me ask you a question because I want to get this clear. You say it's the state's best evidence as to what issue as to Sam's mental state, which was the only issue in dispute at trial, whether he was insane or guilty but mentally ill or guilty. That was the only issue in dispute. And the state argued that its best evidence was the video tape. Um, and that's why that's going to mental state. Yes. Yes. Because their experts argued to the jury that the videotape statement was closer and tried closer in time to the offense than all of his mental health history. Like the defense expert was trying to focus the jury on. So according to the state, the video was what they should focus on. Um, in this case, the error was even more egregious than in people versus Ammons because the people versus Ammons, it was just an audio of the defendant's confession. And in this case, it was a video admitted, meaning the jury heard his words and saw his behavior, demeanor and actions on the videotape statement. And Dr Zoop, the state's expert testified that it was not just the defendants words that led her to her conclusion that she was saying, but it was also his demeanor. It was also his presentation. It was also his behavior in the video. And so all of those layers were presented in the video and but they were presented to the issue of insanity, weren't they? I mean, her testimony presented to the issue of his of his mental state. Correct. The state army question is, did she give some testimony upon cross examination by the defense counsel that went to the issue of mental state but established basically guilty but mentally ill? Oh, yes. She conceded that trial that by the statutory definition of guilty but mentally ill that he fit that that he was guilty but mentally ill. She did concede that in cross examination. Yes. Um, the issue here was also more egregious than an ambulance because in this case, the video also contained a 22 2nd colloquy that the state had been ordered to redact from the video that it did not redact. Um, in particular, the state was supposed to redact a portion of the video where Sam told the detectives that he was on supervision at the time of the offense, and he knew he was not supposed to touch his wife. The trial court had ordered the state in a pre trial motion eliminate to redact that portion of the video, and it did not. So the replay of the video had two layers of prejudice. The jury saw twice the video, and they also got evidence that had been precluded and found improper. They saw that twice as well. Um, in light of the closest of the evidence of this case, the replay of the video, along with the improper references to Sam being on supervision could very well have tipped the balance in favor of the state. Um, the case was a close case on the issue of insanity. We have one expert testifying that he's insane and another testifying he's not insane, and both experts had evidence to support their theory. That is a classic close case, and the evidence was even closer on the issue of guilty but mentally ill because, as Justice Holdridge said, even the state and even the state's expert conceded that he was guilty but mentally ill. And Sam only had to show by a preponderance of the evidence that he was guilty but mentally ill. That's a very low standard. That's 51%. That's all he had to prove to show that he was guilty but mentally ill. So that makes it even easier to prove a jury deliberations. The jury sent out a note during the deliberations, asking the judge to clarify the guilty but mentally ill, um, instruction, and that's because they were grappling with that verdict. They didn't immediately just find him guilty. So all of these things put together show that the evidence was closed on not just insanity, but also on guilty but mentally ill, Your Honor. Um, and this error that occurred when the state replayed the case was exacerbated by the multitude of other errors that occurred during the closing arguments, many of which the state concedes or doesn't dispute, and it's brief. The state concedes that the prosecutor misstated Dr. Stampley's testimony regarding whether Sam needed mental health treatment after his arrest. The state concedes that the prosecutor improperly disparaged Sam's attorneys by insinuating that they fished around for any expert that would find Sam's, um, insane and that Dr. Wahlstrom was their last resort. The state concedes that the prosecutor improperly injected his own personal opinion when he stated, I'm sorry, I tend to get long winded when I feel strongly about something. The state also doesn't dispute that the prosecutor violated that pretrial motion in Lemonade by failing to redact the video. And finally, the state doesn't dispute, um, that the prosecutor misled the jury to believe that they could infer Sam's sanity from the fact that Dr. Stampley did not find Sam insane. And these are just the instances that the state concedes or doesn't dispute. There are plenty more instances in my briefs of misconduct by the state, but the prosecutor's actions constituted a pervasive pattern of misconduct that went to the ultimate issue in the case. All of this misconduct went to the issue and dispute Sam's mental state. Like for instance, when Dr. Zook testified at trial that Sam fit the statutory definition for guilty but mentally ill, she testified that, and I quote, he was afflicted with a substantial disorder of thought, mood or behavior, which impaired his judgment. That is word for word what the IPI instruction says that the jury was given. But yet, the prosecutor in opposing arguments tells the jury that Zook did not testify that, um, that he was guilty but mentally ill. And so the court doesn't sustain defense counsel's objection to that improper argument. And then what we see is in deliberations, now the jury is confused. They send out a note to the judge asking for clarification on this guilty but mentally ill definition. And that's, that's one definition they should have had no confusion on because even the state agreed that, that he was guilty but mentally ill, word for word with that instruction that they received. But this just shows how the state's, you know, misstating the evidence and then the judge's failure to sustain the objection, how it caused confusion with the jury and affected their deliberations. And another instance of misconduct that went straight to the ultimate issue in the case, this was a very blatant instance which the state concedes was error. Dr. Stampley testified, and I quote, that Sam was suffering from a mental illness that did need to be treated and then treated appropriately through the use of his medication. Yet, the prosecutor in rebuttal closing argument told the jury that Stampley stated that he did not need mental health treatment. And this is one of the, this is one of the improper arguments that the prosecutor continued with even despite a sustained objection. And if you just look at these two instances that I gave you of the, of the prosecutor misstating Dr. Zut's testimony, misstating Dr. Stampley's testimony, I mean, what we see is the prosecution changing around even its own witness's testimony to try to strengthen its case. Dr. Zut and Dr. Stampley both were state's witnesses, and the prosecutor is trying to change their testimony to make it stronger. And the question is, why? Why does the state feel the need to try to change its own witness's testimony? And the answer is clear, because the prosecutor had the superior expert in this case. Dr. Wallstrom was the superior expert. He came across more, he did, he did a more thorough examination of the case. He was a doctor, he was a psychiatrist, whereas Zut had no medical training at all. She was a psychologist. Dr. Wallstrom has spent 40 hours reviewing the case. And Dr. Zut spent half of that, she spent 20 hours. Dr. Zut's report that she presented was full of errors, and the jury saw that, the jurors, she got a lot of dates wrong. She didn't know that Dr. Agaby was a woman. She didn't even know that the letters that were submitted by Dr. Agaby were fraudulent. And she relied on those fraudulent letters when forming her opinion. And if Dr. Zut had only just thoroughly read Dr. Wallstrom's report, which she said she did, she said she read Dr. Wallstrom's report before she wrote her report. But if she had, she would have known those letters were fraudulent, because Dr. Wallstrom said that in his report, that Sam lied to get those letters. And so the jury is hearing all of this, of her sloppy work on her report, her lack of thoroughness, all the things that she's missed. And so now the state is trying to compensate for the mismatch between Dr. Zut and Dr. Wallstrom's testimony by misstating the testimony of his witnesses. And the state goes even further than that by improperly disparaging Dr. Wallstrom's testimony. This is another error that the state concedes of prosecutorial misconduct. When the state, a prosecutor argued, but we don't have anybody who testified that he's insane, except now we have to get somebody and let's get Dr. Wallstrom. Seems like a nice man. He's the last person. We have to find someone. That was totally improper. Dr. Wallstrom was not a hired gun. He was not, you know, Dr. Zut even admitted he was a man of integrity. He could not be bought just to give an opinion based off what the defense wanted, you know, and he also had not been hired by defense counsels. And he was a highly respected, highly respected professional in his field. And the state continued with that argument until the until the judge sternly warned the prosecutor to cease that. But I mean, this all goes to show you how the prosecution was trying to prop up its weak case with misconduct. And in this case, it was just a pervasive pattern of misconduct occurred during the trial, during the opening closing argument, during the rebuttal closing argument. In total, there were 36 objections to the prosecution's closing argument, 14 of which were sustained. The prosecutor voices opinion 12 times during the closing arguments, and five times at least five times, the prosecutor continued on with argument after a sustained objection, Your Honors. So this court should find that the prosecutor's actions constituted a pervasive pattern of misconduct that denied Mr. Sam a fair trial. And for these reasons, we ask that the court will reverse and remand this cause for a new trial. Any relevance to the fact that there was no request for a mistrial? No. Are you asking if any of these issues are waived because there was no request for mistrial? Well, I suppose it's another way. Because all of the issues are preserved. Right. Yeah, the issues are preserved, fully preserved. Thank you. Any other questions from the court? No. No, thank you. Okay. Ms. Warey, you'll have time in reply. Thank you. Mr. Atwood, you may respond. May it please the court. Good afternoon, Your Honors. Counsel, my name is Nicholas Atwood, and I represent the people of the state of Illinois in this matter. As counsel mentioned, there are two issues before the court, and I will attempt to address both of those in the limited time that I have available. With regard to the first issue, defendant complains that it was error for the trial court to allow the state to play the redacted portion of defendant's interview during their opening statement of closing arguments because counsel believes that unduly emphasized that evidence. However, it wasn't an undue emphasis of that evidence, and there's a series of factors that the court is supposed to consider before that evidence is admitted. And those factors include the completeness of the video, the amount of time the video takes is compared to the trial as a whole, not simply the closing argument, and if that video demonstrates inconsistencies within the evidence. And so in this case, we know that the video was redacted approximately 20 minutes. So we had a video that was approximately 40 minutes long that took place in a trial that was approximately 40 hours long that occurred over the course of eight days. Counsel believes it was an undue emphasis for the jury to see this video twice, but it's worth mentioning that approximately eight days had elapsed since the jury had seen the video. Moreover, both of the experts did rely significantly on the video itself in determining defendant's state of mind. While it is true that Dr. Wahlstrom relied quite a bit on evidence from reports and medical documents in months or years prior to the incident, he did think the video was significant enough that he viewed it with defendant's family in order to determine whether or not there were inconsistencies in his behavior and make notations based on their reactions. Mr. Atwood, you blanked out, at least on my side. Could you repeat that, please? With regard to the video, Your Honor? Yes. Yeah, so Dr. Wahlstrom and Dr. Zhu both relied on the video when they came to their conclusions regarding his mental state. And Dr. Wahlstrom even went so far as to schedule time to watch the video with defendant's family in order to gain additional insight on his mannerisms, his behavior during that video. So it's clear this was a significant piece of evidence, and it was being used to demonstrate inconsistencies between both experts. Both experts testified they viewed this video, yet they reached opposite conclusions. So if you're looking at that three-factor test, the video is an essential piece of information, and it was used by both sides in trying to prove their theory of the case. That makes it totally different from Ammons. In Ammons, the video was played during rebuttal in closing argument, which was significant in that case. In the present case, it was played during the opening of the state's closing argument, which allowed defense counsel the opportunity to dedicate time during his closing argument to address and rebut any instances within that video. That's an important factor to consider because the defendant in Ammons did not get the last word. Moreover, in Ammons, that was the only evidence was the defendant's audio confession, and it directly contradicted his own trial testimony. In this case, we have hundreds and hundreds of pages of expert testimony. We have additional medical reports, coroner's reports, police reports, and eyewitness testimony. We have significant other pieces of evidence that were for the jury's consideration, such that the replaying of this video did not unduly emphasize the very different from Ammons. Moreover, the trial court was aware of the Ammons decision. In fact, tried to tailor the presentation of this video during the argument to Ammons. The court specifically avoided allowing the state to play it during their rebuttal to reduce any potential prejudice from that way. And second, the court did can reduce the video, but did allow it to be played in its completeness. So it wasn't a situation where the state is just picking and video that are clearly going to prejudice the defendant. Both parties have the advantage of, let's see the whole video. Defense counsel can point to the evidence in the video, such as defendant asking the same question over and over, or, you know, sort of appearing that maybe he's not with it. And the state can point to evidence of his remorse, of his, you know, lucidity, as far as explaining what happened. So both parties were able to use this. Speaking of lucidity, what was the state thinking by not redacting the supervision section of the video pursuant to the motion to eliminate ruling? I'm not aware of what the exact prosecutor was thinking. My best guess is it was just simply a mistake that was overlooked. There was a ton of evidence in this case. It was a lengthy trial. It seems that it just, somebody forgot to cut that out. But on that point, you know, the defendant has to be prejudiced by that information. And so when we're considering the word supervision against all the other evidence has been presented in trial, can we really say that that innocuous word prejudiced him, especially when his own expert, Dr. Wahlstrom testified about the fact that defendant was operating under a court order. He didn't use the word supervision, but he testified to the fact that defendant was under some form of a court order. And if the defendant had been dishonest in obtaining those letters from Dr. Gabay, because he wanted to show progress for the court. So is it really prejudicial? I would say not. It's simply a word supervision. Most jurors are going to be familiar with it in the context of getting a traffic ticket. So in a murder case, with all the other reams of evidence that we have, I don't feel that that was something that was so prejudicial that it tipped the scale of justice against defendant. Moreover, getting back to the video, the admission of the video itself, even if the court found that it was error for that to be admitted, it still has to, you know, avoid harmless error. And I think it is harmless error when you look at the other evidence. This is a case primarily of two experts testifying on the defendant's state of mind. As counsel noted, Dr. Wahlstrom and Dr. Zut had differing opinions, but it was up to the jury to determine which of them was more credible and whether or not there was sufficient evidence to show one, that defendant was not insane and two, that he was not guilty, but mentally ill. And so defense counsel claims that Dr. Zut testified unequivocally that defendant was guilty, but mentally ill, but that's not what Dr. Zut testified to. She testified generally that yes, he suffered from a mental illness, which was depression, but on page 1423 of the record, she unequivocally said that despite his mental illness being depression, he was able to appreciate the criminality of his acts. And in order to be guilty, but mentally ill, he cannot be able to appreciate the criminality of his acts. And so she did not testify and the generally about him having a mental illness and that that mental illness can affect his decision making. I believe she said that, you know, some days it can be better than other days, something to that effect, it can come and go. But she said on the day that this murder occurred, which is the relevant time, he was able to appreciate the criminality of his acts. And there were several pieces of evidence presented that established that. First, Jennifer Mazur testified, she was the eyewitness in this case. She drove by as defendant was his wife. She testified that she made contact with the defendant eye to eye contact and he followed her as she drove. Defendant stated that he went back inside and waited for the police to come. So it's clear defendant knew he had been seen doing this. And after the murder was committed, he simply walked back inside. But the other evidence that was important in this case is there was no evidence or testimony that indicated defendant was hallucinating on the day he killed his wife or that he was suffering from any kind of delusions. What happened was his wife came home and she insulted and provoked him and chastised him for laying in bed all day instead of going out and getting a job. The evidence established that the defendant had been unemployed for a couple of years and that since they had moved to the United States, he really had a hard time providing for his family. In Egypt, his home country, he was a respected member of society. He was a teacher. But in the United States, he had just had a hard go of it and become a failure. And over time, that had caused him to get angrier and angrier. There was evidence presented in the coroner's report that Nermeen had had previous head traumas and other evidence of assault. And their daughter Marina testified to a severe instance of abuse just six months before the murder where defendant was choking Nermeen with a cord in their garage, saying he was going to kill her. So on the day that this murder occurred, Nermeen insulted the he flew into a violent rage, chased her out of the bedroom, grabbed a metal bar, and bludgeoned her to death in their front yard. And then after realizing what he'd done, he went back inside and he waited for the police to come. Dr. Zhu pointed to other evidence that he was aware of the criminality of his actions. When during the video, he repeatedly made references to asking, is his wife dead? And he was concerned with what would happen to the children because he was aware that he'd thrown his life away and that he was guilty of committing a crime and would likely face a prison sentence. All of that are reasonable inferences for the jury to make that this defendant was not insane or that he was unable to appreciate the criminality of his actions. And on that point, with regard to Dr. Zhu versus Dr. Wallstrom, defense counsel makes reference to some typos and things like that in Dr. Wallstrom's report and tries to emphasize that, oh, she must've done a very poor job because she made typos and wasn't aware that Dr. Agave was a female and not a male, even though there was no indication for her to really be able to understand that. Dr. Wallstrom was unaware entirely that Nermine had Phentermine in her system. Phentermine is an amphetamine that's a weight loss drug that causes individuals to lose their appetite and to have sleep disorders. Dr. Wallstrom placed a significant emphasis on the fact that he believed defendants suffered hallucinations in the fact that his mother-in-law, he believed his mother-in-law was poisoning his food. But the record indicates the defendant's mother-in-law was responsible for cooking meals in their home. And it is reasonable for the jury to infer she had given Phentermine to the defendant so that he would be able to stay awake while he was working night shifts. Dr. Wallstrom had no clue that this was even possible. And what the jury was able to conclude is he's based a significant portion of his opinion on this guy having hallucinations, but there is a legitimate, credible inference that can be made that he wasn't hallucinating at all. He was telling a fact and Dr. Wallstrom simply confused that. So if we're going to compare the depth of the research done by the two doctors and reaching their opinions, Dr. Wallstrom missed perhaps the biggest factor in reaching his insanity conclusion. And I think the jury was able to see that. Moreover, while he may be a psychiatrist and Dr. Zut is a psychologist, Dr. Zut has done thousands of criminal insanity and standing evaluations. She's been doing this for over 30 years. She's been working with the Will County Court specifically, the defense side, the state side, both. The jury could easily infer that she's got a specialty within the criminal mindset that Dr. Wallstrom, who's done some work for both sides, but is primarily a private practice psychiatrist, does not have. So given those facts, it's easy to say- So that we can infer that frequency of exams leads to expertise in the exams? Certainly. Every time a witness is certified as an expert before court, they always testify to the frequency with which they've done whatever relevant act is required for them to be an expert. If it were a surgeon, would he be considered more of an expert if he'd done a thousand heart transplants or if he'd done 10 heart transplants? Mr. Atwood, I have one question because I think we're going to get out of time and I'm curious. Okay. What do you put in the problem with, in closing argument, the prosecutor refers to both Dr. that were in this case, not on insanity evaluations, and then repeatedly says they never used the word insane. They never said insane, which to me is an improper inference. They were there to give an opinion on that. They couldn't give an opinion on that. And what it infers is that two doctors, two experts, had an opinion on sanity, the crux issue in the case. He's How do you respond? Well, your honor, I think that you make a good point when you talk about they weren't evaluating for insanity. And that was a point that was made very clear to the jury. The jury was told eight times during closing arguments that these are just arguments the attorneys are making. If they're not based on the evidence that you heard disregard those. And so I think we have to trust the jury followed the jury's instructions, especially in regard to the errors in the closing argument. There were several instances where the prosecutor made inferences that weren't reasonable as I conceded in the brief. But I think specifically they just reflected fully on the prosecutor, not on the evidence. When you compare these errors, you have to say that the defendant was prejudiced by it. And are we going to say that the defendant was prejudiced because these doctors, which they knew weren't evaluating him for insanity, were alleged to have not found that he was insane? Or are we going to place more emphasis on the pages of testimony by Dr. Zut, all the facts that supported this was an act of serious domestic violence, not an act by an insane person and not an act by someone who couldn't appreciate the criminality of their actions. So yes, there were a number of errors that happened during closing argument, some of which just reflected fully on the prosecutor, like his clear error in referring to Dr. Wallstrom as some sort of a gunner and that the attorneys were not hired him. They were corrected immediately when they happened. And as counsel noted, 14 of these objections were sustained. So we must give some weight to the fact that these objections were sustained or defense counsel was able to immediately correct the improper statement and that the jury then followed the instructions when they considered all of this other evidence that was presented in the trial. I think there were some improper comments and I see them out of time, so I'll briefly end. There were some improper comments, but you still have to find that they were prejudicial to him. And when you look at all the other evidence from Dr. Zut, the video, everything else that was presented, I think it's clear the jury could have come to the conclusion that they did and that defendant was not prejudiced by the prosecutor's statements in closing arguments. And with that, if there are no further questions, I would ask the court to affirm the jury's guilty verdict and the defendant's sentence. Thank you. Any questions from the court? I have no more. Do you? I do, if I may. Oh, absolutely. Certainly. So, Dr. Zut on cross-examination acknowledged that the defendant had a mental illness and that that mental illness impaired the defendant's judgment. She answered yes to those questions on cross-examination, which at least from my understanding is what guilty but under the statute. You take that expert opinion and Dr. Waldstrom's expert opinion, and every expert agrees either this defendant is insane or guilty but mentally ill, but neither of them are opining that he's just straight out guilty. There's no other expert testimony. And I guess my question for you is this, does that concern somehow inform how we should look at these just, I'm sorry, but just repeated improper comments by the prosecutor at close and mischaracterization of the evidence? This is closely balanced, in my opinion, on the, my opinion doesn't matter. There's at least an argument that this evidence is closely balanced on the GBMI issue. And these comments by the prosecutor raised the specter that, that the error was not harmless. Do you have an opinion about that? Well, my opinion is my recollection of the evidence is yes, she did say he suffered from mental illness and one disputes that he suffered from mental illness, but to be guilty but mentally ill, that mental illness had to come into play at the moment he committed the crime. And Dr. Zut's testimony was he appreciated the criminality of his acts. No, no, no, no. That was not the testimony. And that, but that's the, that's the insanity standard, not the GBMI standard. Right. I have no other questions. Justice. I would just say in closing that I don't believe that his mental illness played a factor in that because it was, it was depression. Depression doesn't cause people to commit violent murders. If he had a mental illness, such as a schizophrenia or some other, And you're an expert on that conclusion on depression. That is simply just an inference from the evidence. You're on. I think we're done here. Thank you, Mr. Atwood. Ms. Ware, you may respond. Thank you. Or reply rather. Thank you. The state mentions that eight days had elapsed since the jury saw the video as if that entitles the state to play it again. There is no case that says that the length of time between the time that they view the evidence the first time and the closing arguments is a factor in this analysis. You know, it was the state's choice to play that video on the first day. They didn't have to, that was their choice. It doesn't entitle them to hold a jury captive and play it again in closing arguments. Now, if the jury needed refreshing on what the video said, they could have asked for it during deliberations. But for the state to hold them captive and force them to watch it again was unduly emphasizing that single piece of evidence, like what Ammons talks about, your honor. And also, counsel says that both experts relied on the video. That is a mischaracterization of the evidence. Defense counsel tried to suppress this video. This video was not helpful for the defense. In fact, Dr. Wallstrom is trying to focus the jury on other things. Dr. Wallstrom testifies on a direct for 119 pages. Most of it is trying to focus the jury on the defendant's mental health history over the year as he's declining and not taking his medication and being diagnosed with psychotic disturbance and things like that. Dr. Wallstrom is telling the jury, this is what is important. Yes, Dr. Wallstrom has to address the tape in his art, in his testimony. But it was not as if this was defense evidence and both defense and the state were using it to their advantage. No, defense counsel would not have tried to suppress it if it was helpful to the defense. Also, counsel mentions that it's significant that the video was replayed in opening rather in rebuttal because the defense had the opportunity to play the video and their argument. But defense counsel could not undo the playing of the video. The video was not something defense counsel wanted to show. As mentioned, defense counsel tried to suppress the video and he could not undo the prejudice of the video being played by playing it again. Counsel also mentions that just the fact that defendant was on supervision, that one fact that wasn't redacted from the video, that it wasn't that prejudicial or whatever. But the 22 second portion of the video that they were supposed to redact said that he was on supervision by the court and that he knew he was not supposed to touch his wife. All of that went to his mental state. It also injected issues of sentencing, that he had already been sentenced by a court previously. That court was not able to correct his conduct because now he's violating the supervision order and committing another offense. That's why they were ordered to redact it because it was improper. Can I just ask two questions? One, the other crimes evidence that the daughter testified to, the jury already heard the facts of that and that was what the supervision related to. Is that fair? Yes. My other question is this. At closing, did the state argue that the defendant was not insane and understood the criminality of his actions? On this video, you see him telling the police officers, I didn't want to hit her because I knew I wasn't supposed to. Did they make that argument at closing? No, but they replayed the video in closing. They didn't argue that? Correct. Yes, you're correct. But what I wanted to mention is if the state thought that this one moment on the video where he says he's on supervision was insignificant, they would not have fought so hard to admit that portion of the video. Because what happened was after the state had already won the motion to eliminate, allowing them to admit the other crimes evidence in general, then they did a separate motion asking, can we also keep in this 22 second portion of the video? And if they thought it was insignificant, they would have done a second motion to try to make sure the jury heard this part of the video. Also, the defendant, I'm sorry, the state argues that 14 of the objections to the misconduct were sustained at trial. But we have to remember that most of these objections, the prosecutor continued on despite the sustained objection. And the case law says that when a prosecutor does that, they undo the salutary effect of the sustained objection. So we can't focus on the poor sustaining objection to cure the prejudice because the prosecutor continued on. Even if you look at the voicing of the opinions, he continued on even though he was getting sustained objections to that. Also, this court is absolutely right. In order to prove guilty but mentally ill does not have to prove that they can appreciate the criminality of this conduct. If you look at IPI 24-2501C, all they have to prove is that they were afflicted with a substantial disorder of mood, thought, behavior, which impaired their judgment, but not to the extent that he was unable to appreciate the wrongfulness of his behavior. So he did not have to prove that. And in this case, Ms. Ware, the red light's on. Your time has expired. But the court may have some questions. Are there questions for Ms. Ware? I do not, thank you. I do not. For these reasons, I'd ask this court to reverse the remand for a new trial. Thank you, Your Honors. Okay. Thank you, counsel, both for your arguments in this matter this afternoon. It will be taken under advisement, a written disposition will issue. Our clerk of the court will escort you out of your remote courtroom now and we'll proceed to conference. Thank you.